Crystal Foley (SBN 224627)
cfoley@simmonsfirm.com
**Simmons Hanly Conroy LLC**
100 N. Sepulveda Blvd., Suite 1350
Los Angeles, CA 90245
Phone: (310) 322-3555
Facsimile: (310) 322-3655

Paul J. Hanly, Jr. (*pro hac vice* to be submitted)
phanly@simmonsfirm.com
Mitchell M. Breit (*pro hac vice* to be submitted)
mbreit@simmonsfirm.com
**Simmons Hanly Conroy LLC**
112 Madison Avenue
New York, NY 10016-7416
Telephone: (212) 784-6400
Facsimile: (212) 213-5949

Attorneys for Plaintiffs

Additional Counsel on Signature Page

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF CALIFORNIA**

| | | |
|---|---|---|
| DOUGLAS KREBSBACH, KATHLEEN KREBSBACH, JAMES ALEXANDER, and MARTHA ALEXANDER on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br>v.<br>FORD MOTOR COMPANY,<br><br>Defendants. | ) | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br>**DEMAND FOR JURY TRIAL** |

**INTRODUCTION**

Plaintiffs Doug Krebsbach, Kathy Krebsbach, James Alexander, and Martha Alexander, (collectively "Plaintiffs") on behalf of themselves and all others similarly situated, allege the following against Defendant Ford Motor Company including but not limited to its divisions Lincoln Motor Company and Mercury (collectively "Ford"):

## I. SUMMARY OF CASE

1. Historically, automobile sunroofs have been modestly sized, spanning just a small portion of the roof over the driver and front passenger seats. Starting in the mid-2000s, sunroofs expanded in size to cover almost the entire roof. While these sunroofs are aesthetically pleasing, and thus command a premium price, they also pose new and significant engineering challenges. Replacing metal roofs with large plates of glass requires precision in the strengthening, attachment, and stabilization of the glass. Ford and other manufacturers failed to meet these engineering challenges, with several manufacturers issuing safety recalls because of the panoramic sunroofs' propensity to spontaneously shatter.[1] For Ford vehicles, at least seventy owners of vehicles with defective sunroofs (two of them being fleet owners of Lincoln MKTs reporting multiple incidents in a single report) identified herein have reported to the National Highway Traffic and Safety Administration ("NHTSA") that at least eighty panoramic sunroofs have shattered. (http://www-odi.nhtsa.dot.gov/owners/SearchSafetyIssues; *accessed September 5, 2016*.) The shattering events are so powerful that startled drivers compare it to the sound of a gunshot, after which glass fragments rain down upon the occupants of the vehicle, sometimes while driving at highway speeds.

2. Ford has known about this problem since at least 2008 due to a number of NHTSA complaints of the defective sunroofs shattering in the Ford Edge.

## II. PARTIES

3. Douglas Krebsbach is a citizen and resident of Folsom, Sacramento County, California.

4. Kathleen Krebsbach is a citizen and resident of Folsom, Sacramento County,

[1] Ford refers to the enlarged sunroofs as Panoramic Sunroofs, Panoramic Vista Roofs, Dual Panel Moonroofs, or Power Moonroofs depending upon the vehicle model. For consistency, all will be referred to as "panoramic sunroofs" or "defective sunroofs" in this complaint.

California.

5. James Alexander is a citizen and resident of Foley, Baldwin County, Alabama

6. Martha Alexander is a citizen and resident of Foley, Baldwin County, Alabama.

7. Ford Motor Company is a Delaware Corporation with its principal place of business at One American Road in Dearborn, Michigan 48121. Ford is in the business of designing, manufacturing, and distributing motor vehicles. Ford's vehicles include those sold under the Ford, Lincoln, and Mercury brands.

8. At all times relevant to this action, Ford designed, manufactured, marketed, distributed, and warranted the vehicles at issue in the State of California and throughout the United States.

## III. JURISDICTION AND VENUE

9. This Court has jurisdiction over this class action under the Class Action Fairness Act, 23 U.S.C. § 1332 (d). There are at least one hundred members of the proposed class(es). The aggregated claims of the individual class members exceed the sum value of $5,000,000.00, exclusive of interest and costs. Ford and more than two-thirds of the proposed plaintiff class are citizens of different states.

10. This Court may exercise jurisdiction over Ford because it is registered to conduct business in California, it has sufficient minimum contacts in California, and it intentionally avails itself of the markets within California through the promotion, sale, marketing, and distribution of its vehicles, thus rendering jurisdiction by this Court proper and necessary.

11. Subject-matter jurisdiction also arises under Magnuson-Moss Warranty Act claims asserted under 15 U.S.C. § 2301, et seq.

12. Venue is proper in this District under 28 U.S.C. § 1391 because Ford transacts

business in this District, and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## IV. SUBSTANTIVE ALLEGATIONS

### A. The Ford Panoramic Sunroof Defect

13. Ford manufactures, markets and distributes automobiles in the United States under the Ford, Lincoln, and Mercury brand names. The Ford automobile models that are the subject of this case (including Electric and Hybrid Models) are the Ford Edge 2007-present, Ford Flex 2009-2016, Ford Focus 2009-2016, Ford Fusion 2010-present, Ford Explorer 2011-2016, Ford F 150 2011-2016, Ford Mustang 2009-2014, Ford Escape 2013-2016, Ford Transit Connect 2014-2106, Ford C-Max 2013-2016, Lincoln MKX 2007-2016, Lincoln MKS 2009-2015, Lincoln MKZ 2013-2016, Lincoln MKT 2010-2016, Mercury Milan 2010-2011, and Mercury Montego 2010-2011 with factory-installed panoramic sunroofs (collectively "Class Vehicles"). Plaintiffs anticipate amending the Class Vehicles definition upon Ford identifying in discovery all of its vehicles manufactured and sold with the optional panoramic sunroof.

14. Starting in at least the 2007 model year, Ford introduced vehicles with an optional upgrade of a factory-installed panoramic sunroof. The panoramic sunroof designs in all of the Class Vehicles are substantially similar in design and manufacture.

15. Ford generally markets the panoramic sunroofs as a luxury upgrade, available even in its lower-end cars like the Ford Focus or C-Max. The cost to upgrade the sunroof, depending upon the vehicle, ranges from over one thousand to several thousand dollars. The actual material cost of the panoramic sunroofs is relatively low, making the option one of the most profitable features in the automotive industry. See an example advertisement for the panoramic sunroof in the 2008 Ford Edge.




16. Panoramic sunroofs are made of tempered or laminated glass that attaches to tracks, which in turn are set within a frame attached to the vehicle. Most panoramic sunroofs, including those offered by Ford, include a retractable sunshade. Examples of panoramic sunroofs appear in the photographs below.

**2012 Lincoln MKX**



**2008 Ford Edge**



**2011 Ford Explorer**



**2013 Ford Escape**



17. Panoramic sunroofs present manufacturing, design, and safety challenges for manufacturers because the large plates of glass take up much of the surface area of the vehicle's roof.

18. One particular challenge is the material make-up of the glass. Whereas some manufacturers, such as Volvo and Honda, have used a *laminated* glass, other manufacturers, such as Ford, Nissan, Kia, Hyundai, and Volkswagen, have opted to install panoramic sunroofs with *tempered* glass that feature large areas of ceramic paint.

19. In the automotive industry, generally tempered or toughened glass is made in the same manner: a piece of annealed glass is shaped and cut as to original equipment manufacturing ("OEM") standards. The glass is heated and then rapidly cooled, i.e., tempered. The tempering process creates an outer layer of glass that is compressed (similar to being shrink-wrapped) around a middle core of the glass that is constantly pressing outwards creating tension or tensile force. The compressive and tensile layers create a stronger piece of glass as compared to non-tempered glazing. However, if the compressive layer is compromised the entire piece of glass fails catastrophically and often explosively.

20. Problems with panoramic sunroofs are compounded by Ford's use of thinner glass. Car makers use thinner glass in panoramic sunroofs to save weight and improve vehicle fuel efficiency. Thinner glass, however, is very difficult to temper properly (especially when thicknesses are 4 mm or less) as the compressive layers are thinner, increasing the probability of catastrophic failure.

21. Additionally, the tempered glass used in the Class Vehicles features a ceramic paint applied prior to tempering. Automotive ceramic paint or ceramic enamels are composed of fine powders of low melting point glass frit, pigments, and other additive oxides, sulfides, or

metals. After application of the ceramic enamel, the glass is then tempered, as described above. These ceramic enamels are applied on the top around the edges of panoramic sunroof glazing and serve aesthetic and functional purposes. The ceramic paint area appears as a "black band" along the edge of the glass.

22. Ceramic enamels are known "adulterants" and significantly weaken the structural strength and integrity of the Class Vehicles' tempered panoramic sunroof glazing. Among other factors, ceramic enamels compromise glass strength because: (1) the enamels have different thermal expansion coefficients than the glass substrates (the glass and the paint expand at different rates), resulting in residual stress between the ceramic enamel and the glass substrate; and (2) the glass frit will ion exchange with the glass substrate lessening or eliminating the compressive layer above the tensile region thereby significantly weakening it.

23. The ceramic paint area is relatively small in conventional sunroofs, but ceramic paint areas have become larger with the advent of panoramic sunroofs resulting in the glass becoming progressively weaker, more likely to spontaneously burst and, for the unsuspecting driver and passengers, more dangerous.

24. In 2013, the Korea Automobile Testing & Research Institute ("KATRI") concluded that the enamel used for ceramic paint areas in panoramic sunroofs like those installed in Ford vehicles impairs the strength of the glass, making it not only less durable than the usual toughened glass, but also less durable than ordinary glass.

25. Following KATRI's report, an Informal Working Group on Panoramic Sunroof Glazing was established by the United Nations Economic Commission for Europe to evaluate the safety of panoramic sunroofs. The Working Group is chaired by a representative from KATRI and is considering whether to amend the UN regulations on safety glazing. At the end of June

2016, the Working Group confirmed that conventional automotive glass enamels weaken the mechanical strength of panoramic sunroof glazing.

26. Another challenge presented by the panoramic sunroofs is the need to ensure the sunroof glass is fastened to the vehicle with a sufficient degree of tightness. Ford and other manufacturers fasten the sunroof in a manner that reduces road and wind noise, and makes them less susceptible to rainwater incursion. At the same time though, flexing and vibration caused by ordinary driving imposes stress on the sunroof, ultimately causing the glass to shatter. In the Ford models at issue, the compromised tempered glass cannot withstand the pressures and flexing that the sunroof frame and vehicle demand, even when the vehicle is brand new or is parked and sitting still.

**B. Consumer Complaints Reveal the Magnitude of the Defect**

27. Below are just a few examples of the numerous complaints lodged with NHTSA. Few, if any, of the drivers who have filed reports with the federal government have reported that their panoramic sunroof shattered because of an object striking their vehicle. The complaints are also viewable online at www.safecar.gov.

> 2008 Ford Edge: Enclosed are a description and the other information about the Ford Edge you requested. This is part of what was sent to the Ford Motor Company after the sunroof claim was denied on the basis that they feel something from the outside hit the sunroof. On July 24, 2008 at about 8:00 pm, my brother in laws was driving my car on Interstate 75 just north of Bowling Green, Ohio. He was driving 60-65 mph with the windows up, the air conditioner on, and the sunroof closed. As he was driving, he reports a sudden explosion in the car, like he was shot. He and the passenger had small shards of broken glass rain down on them. They managed to safely pull the car to the brim of the highway without any further problems. Upon examining the sunroof, they observed a hole the size of a small dinner plate in the center of the roof and all four corners missing. The glass in the middle and corners of the sunroof had the appearance ?like a volcano? out of the car. Both the driver and the passenger reported that there were

no overpasses or cars around them to kick up any object that could have hit the roof. The glass from the hole was not in the car. I feel this claim has been denied unjustly and that the Ford Motor Company and Planet Ford of Centerville are closing their eyes to an issue that should be investigated thoroughly by someone in person instead of sending ?digital pictures? to someone at corporate to make a decision. After all, this is a safety issue that could have been fatal, leaving Ford with a much bigger problem than just replacing a faulty sunroof. Sincerely, 2008 Ford Edge Limited*TR.

(NHTSA ID: 10237272 – Date Complaint Filed 08/06/2008)

2013 Ford Edge. The panoramic sunroof exploded and shattered. This was not due to any impact or collision of any type, to include debris, flying pebbles, etc. The sunroof exploded outwards, with the glass pushed upwads. Additionally, the glass was shattered in all four corners. This is a design defect, with documented recalls against many makes/models. This exact situation has happened to hundreds of other people/vehicles whether driving at highway speeds or parked. In every case, the scenario appears to be the same: the tempered glass exploded due to design failures while operating the vehicle under normal/routine conditions. Recall requested.

(NHTSA ID: 10863812 – Date Complaint Filed 05/08/16)

2014 Ford Flex. My wife and I were driving on a 2-lane highway in our vehicle at the approximate speed of 55 mph. Our Ford Flex was equipped with a factory sunroof, which was in the closed position, and the sunshade was open. As we were traveling down this road, with no traffic coming in the opposite direction, or in front of us, we heard a shotgun sound come from above our heads and glass flew everywhere in our vehicle, including the back where our 5-year old daughter was sitting. Our sunroof literally exploded!!!! We closed the sunshade and immediately traveled to our local dealer where we purchased the vehicle. My think at first was that something his the glass, but yet nothing was around us that could have thrown anything onto the glass to break it. When we arrived at the dealership, we exited the car and when I looked at the huge hole in the sunroof, all of the glass surrounding the hold was pointing upwards as if the glass had literally exploded upward, not down into the car. I have never heard of anything like this happening, and luckily my wife was under control enough when it

happened that she didn't swerve off the road. After the dealership submitted details of this incident to Ford, they rejected to do anything to take care of this repair for us. I have since had to file a claim with my insurance to get it fixed, and have been contacting Ford executives on a daily basis, and contacting media sources, to get attention to this safety issue. I have found several other cases that stretch back to as far back as 2008 so far, with a description almost identical to ours. This is a safety issue that needs to have attention brought to before somebody gets seriously hurt or dies. *TR

(NHTSA ID: 10606988 – Date Complaint Filed 06/30/2014)

2016 Ford Explorer. The rear sunroof exploded, I was driving down Tollway 99 out side of Houston Texas, at about 60 mph. The roadway is flat and straight the 4+ lanes are 150 yards apart, no overpasses. There were no other cars or trucks within 100 yards or more. And a very loud noise, like a gun shot "blew out" the rear glass (the front does not move, the rear cannot) in the sunroof. I only have about 8000 mile on the SUV. Ford does not seem to understand the problem and keeps saying it must have been a rock. I can't prove they are wrong and they can't prove that I am correct. So my insurance pays, which means we all lose.

(NHTSA ID: 10870814 – Date Complaint Filed 05/25/2016)

2013 Ford F-150. In April 2014 our sunroof exploded as we were driving on the highway. We took it to the Ford dealership where we purchased the truck and they said they had never heard of a sunroof exploding for no reason. After further research it looks like this has happened to other people. Ford took no responsibility and charged us $1035.05 to replace the sunroof. Scared us to death when the sunroof exploded. Thankfully no one was hurt.

(NHTSA ID: 10818459 – Date Complaint Filed 01/06/2016)

2014 Ford Escape. My wife and I were driving on a 4 lane highway during the day. We were not operating the panoramic sunroof and the shade was completely open. Suddenly and all at once, the front pane of glass in the sunroof exploded into the cabin. Glass cut my face in two locations and caused bleeding. There was no nearby traffic in front of us or on the side. We were not

traveling under an overpass. We were able to quickly regain control of the vehicle as the breakage caused us to slow down and swerve. There were no other collisions or damage after the sunroof broke. As no object or projectile caused the breakage and there was no prior damage to the sunroof, it is obvious that there was fault with either the glass or sunroof assembly.

(NHTSA ID: 10671793 – Date Complaint Filed 01/12/2105)

2009 Lincoln MKZ. No extraneous variables leading to the rear window explosion. The police were not able to find any contact entry or evidence of vandalism and indicated it was possibly defective glass. Dealership indicated that they would not investigate the possibility of previous stress cracks or design defects, although they admitted that this class of vehicle has severe internal pressure fluctuations while a rear passenger window is open traveling at highway speeds, and this was experienced the day before. The glass shattered while the car was parked, with the temperature being between 65 & 70F, with nobody in it. There were no prior issues with the glass. The only issue with the vehicle prior to the glass was the pressure fluctuations.

(NHTSA ID: 10401537 – Date Complaint Filed 05/18/2011)

2010 Lincoln MKS. While driving the moon-roof exploded from the inside of the vehicle out. The noise was very loud, shot gun type noise, tire blow out, etc.

(NHTSA ID: 10761909 – Date Complaint Filed 09/03/2015)

2013 Lincoln MKT. The panoramic roofs on the Lincoln MKT blow out for no reason. We have 14 MKTs in our fleet we have had close to 10 of the glass roofs shatter. We are very concerned that glass could into a drivers eyes as well as our passengers. Also when they do blow out a good size chunk of the roof blows out and anyone behind us could be in grave danger especially someone on a motorcycle. The design of these roofs is flawed and either these roofs should not be allowed or they should be design with a type of glass or plastic product that won't shatter. Lincoln helped us in some of the incidences with the cost are now telling us a definitive no! Cost to replace a glass roof runs about $1500.

(NHTSA ID: 10759218 – Date Complaint Filed 10/07/2015)

> 2015 Lincoln MKT. We are a limousine service while driving down the highway, the glass roof exploded for no reason, no other vehicle were around.

(NHTSA ID: 10824752 – Date Complaint Filed 02/08/2016)

**C. Ford's Knowledge of the Defect**

28. A survey of driver complaints shows that sunroofs often shatter within weeks or months of purchase, and NHTSA was informed of this problem in Ford vehicles as early as 2008. At least five NHTSA complaints in 2008 were related to panoramic sunroofs shattering in the Ford Edge.

- 2008 Ford Edge. NHTSA ID: 10237272 – Date Complaint Filed 08/06/2008
- 2008 Ford Edge. NHTSA ID: 10236939 – Date Complaint Filed 08/04/2008
- 2007 Ford Edge. NHTSA ID: 10221452 – Date Complaint Filed 03/17/2008
- 2007 Ford Edge. NHTSA ID: 10222852 – Date Complaint Filed 03/31/2008

29. Like other automobile manufacturers, Ford monitors NHTSA for information on emerging problems with its vehicles.

30. In 2011, a Wards Auto piece notes the popularity and demand for Ford's panoramic Vista sunroofs increasing and exceeding Ford's expectations. The article discusses Ford's plans to offer the option on more vehicles. (*See* http://wardsauto.com/news-analysis/panoramic-popularity-catches-ford-guard, "Panoramic Popularity Catches Ford Off-Guard; by Pope, Bryan; August 11, 2011; *website accessed on September 5, 2016.*) In 2012, The Wall Street Journal reported on the panoramic sunroof's popularity among the many vehicle manufacturers who offered it and further noted safety concerns over rollover strength and reports of glass spontaneously shattering.

(*See* http://www.wsj.com/articles/SB10001424127887324024004578173271481039256 "Supersizing the Sunroof, Even in Economy Cars"; by Parmar, Neil; December 11, 2012; *website accessed on September 5, 2016.*)

31. On May 14, 2014 NHTSA opened an investigation of the panoramic sunroofs, initially focused on 2011-2013 Kia Sorento panoramic sunroofs, but the investigation was later expanded to include other vehicle manufacturers including Ford. (http://www-odi.nhtsa.dot.gov/owners/SearchSafetyIssues, NHTSA Investigation ID Number: EA 14002; *accessed on September 5, 2016*).

32. In July 2014, NHTSA sent a letter to Ford requesting specific information regarding its vehicles with panoramic sunroofs, including the model year 2011-2014 Ford Explorer, Edge, and Escape vehicles (referred to in the NHSTA investigation as "Peer Vehicles"). The information requests from NHTSA included, among other items: Ford's sales numbers of Peer Vehicles, identification of the model and supplier of the panoramic sunroofs for the Peer Vehicles, and identification of all complaints received by Ford regarding shattering roofs in the Peer Vehicles.

(http://www-odi.nhtsa.dot.gov/acms/cs/jaxrs/download/doc/UCM516188/INIM-EA14002-63587.pdf; *accessed on September 5, 2016.*)

(http://www-odi.nhtsa.dot.gov/acms/cs/jaxrs/download/doc/UCM516188/INIM-EA14002-63587.pdf; *accessed on September 5, 2016.*)

33. According to Ford's responses dated August 22, 2014 and amended on September 2, 2014, approximately 563,000 Peer Vehicles were sold in the United States and U.S. protectorates and territories, as shown in the chart below. (Note: as Ford explained in its response, the Ford Escape had no panoramic sunroof option until model year 2013.)

| Model | 2011 MY | 2012 MY | 2013 MY | 2014 MY |
|---|---|---|---|---|
| ***Ford Explorer*** | 34,833 | 31,826 | 80,063 | 73,353 |
| ***Ford Edge*** | 58,635 | 31,534 | 83,502 | 15,052 |
| ***Ford Escape*** | N/A | N/A | 91,910 | 62,241 |

(http://www-odi.nhtsa.dot.gov/acms/cs/jaxrs/download/doc/UCM466295/INRL-EA14002-59971P.pdf and http://www-odi.nhtsa.dot.gov/acms/cs/jaxrs/download/doc/UCM466296/INRL-EA14002-60016P.pdf; *accessed on September 5, 2016*.)

34. In those same responses, Ford identified suppliers of panoramic sunroofs in the Peer Vehicles as follows:

a. 2011-2014 Ford Explorer front and rear glass panel supplied by Inalfa Roof Systems and is called Dual Panel Moonroof;

b. 2011-2014 Ford Edge front and rear glass panel supplied by Webasto Roof Systems and is called Panoramic Vista Roof; and

c. 2013-2014 Ford Escape front and rear glass panel supplied by Inalfa Roof Systems and is called Panoramic Vista Roof.

(http://www-odi.nhtsa.dot.gov/acms/cs/jaxrs/download/doc/UCM466295/INRL-EA14002-59971P.pdf and http://www-odi.nhtsa.dot.gov/acms/cs/jaxrs/download/doc/UCM466296/INRL-EA14002-60016P.pdf; *accessed on September 13, 2016*.)

35. In addition, Ford explained how it gathers complaints through its internal system:

a. In Ford's FMC 360 system ("FMC 360"), it receives and documents reports from customers, dealerships, and Ford Motor Company;

b. The Common Quality Indicator System ("CQIS") contains communications and reports from vehicle service and technical support activities and field operations;

c. The Analytical Warranty System ("AWS") contains warranty claims received by Ford; and

d. The Legal Claims/Lawsuits ("Legal Claims/Lawsuits") contain those matters in litigation.

(http://www-odi.nhtsa.dot.gov/acms/cs/jaxrs/download/doc/UCM466295/INRL-EA14002-59971P.pdf and http://www-odi.nhtsa.dot.gov/acms/cs/jaxrs/download/doc/UCM466296/INRL-EA14002-60016P.pdf ; *accessed on September 5, 2016.*)

36. In response to NHTSA's request, Ford compiled its own data for the Explorer, Edge, and Escape sunroof shattering complaints. The number of non-duplicative complaints regarding the Class Vehicles as summarized by Ford are:

**(a) 2011-2014 Ford Explorer**

| **Category of Complaint Information** | **Number of Complaints** |
|---|---|
| AWS | 1 |
| CQIS | 20 |
| FM360 | 9 |
| Legal Claims/Lawsuits | 1 |
| **TOTAL** | **31** |

(http://www-odi.nhtsa.dot.gov/owners/SearchSafetyIssues; NHTSA Investigation ID Number: EA 14002; document: Source: 60020 – Ford 9-2-2014, Appendix C, Ford Explorer [Access Database]; INRD-EA14002-6002P.ZIP; *accessed on September 5, 2016*)

**(b) 2011-2014 Ford Edge**

| Category of Complaint Information | Number of Complaints |
|---|---|
| AWS | 4 |
| CQIS | 44 |
| FM360 | 42 |
| Legal Claims/Lawsuits | 3 |
| **TOTAL** | **93** |

(http://www-odi.nhtsa.dot.gov/owners/SearchSafetyIssues; NHTSA Investigation ID Number: EA 14002; Source: 6018-Ford 9-2-2014, Appendix C, Ford Edge [Access Database]; INRD-EA14002-60018P.ZIP; *accessed on September 5, 2016.*)

**(c) 2013-2014 Ford Escape**

| Category of Complaint Information | Number of Complaints |
|---|---|
| AWS | 1 |
| CQIS | 16 |
| FM360 | 11 |
| Legal Claims/Lawsuits | 1 |
| **TOTAL** | **29** |

(http://www-odi.nhtsa.dot.gov/owners/SearchSafetyIssues; NHTSA Investigation ID Number: EA 14002; Source: 6019-Ford 9-2-2014, Appendix C, Ford Escape [Access Database]; INRD-EA14002-60019P.ZIP; *accessed on September 5, 2016.*)

37. Ford internally tracks information regarding panoramic sunroof failures through drivers, dealerships, complaints, warranty claims, replacement part data, dealings with insurance

carriers, and other aggregated sources. Ford has nearly exclusive access to this information, including its pre-release testing of vehicle components, so it is implausible that Ford had no knowledge very early on about the defect. Ford's data on the limited models and years described above is more than *double* the NHTSA complaints documented for all Class Vehicles.

38. Of note, pursuant to NHTSA investigation EA14-002, on April 14, 2016 NHTSA made a second request for information from Ford to identify all Ford panoramic roofs and complaints of shattered roofs for model years 2006-2016. (http://www-odi.nhtsa.dot.gov/acms/cs/jaxrs/download/doc/UCM514031/INLM-EA14002-63477.pdf; *accessed on September 5, 2016.*)

39. The response from Ford was due on May 16, 2016, but has not yet been posted on the NHTSA website (http://www-odi.nhtsa.dot.gov/owners/SearchSafetyIssuesNHTSA Investigation ID Number: EA 14002; *accessed on September 5, 2016.)*

40. Upon information and belief, Ford is also aware that other manufacturers whose vehicles suffered from similar shattering problems have voluntarily initiated safety recalls to notify drivers of the danger and repair the sunroofs free of cost.

41. Ford has had at least one recall—for its 2014 Ford Escape vehicles manufactured between October 15 and October 22, 2013 where a urethane bond, not ceramic paint, was used to connect the panoramic sunroof to the bracket and was improperly bonded. (http://www-odi.nhtsa.dot.gov/owners/SearchResults/NHTSA Campaign Number 14V403000; *accessed on September 5, 2016.*) That 2014 Escape recall affected 2,124 vehicles. While Ford issued a recall for the urethane bonding problem affecting just over 2,000 vehicles, it has done nothing regarding the far more predominant problem relating to the tempered glass shattering that affects potentially hundreds of thousands or more Ford vehicles. Meanwhile Ford still publicly claims it

has a commitment to quality. In Ford's most recent 2015-2016 Sustainability Report, Group Vice President of Quality for Ford, Bennie Fowler, states:

> Quality is a journey. This journey is about continuous improvement and, ultimately, transformation. As with any journey, you need to decide where you are going and how you are going to get there. At Ford Motor Company, we have a clear destination for our journey: to deliver world-class quality in every region. We reach our destination by improving every day.

(*See*, http://corporate.ford.com/microsites/sustainability-report-2015-16/products.html; *website accessed on September 5, 2016*.)

42. Ford claims that its sunroofs shatter as a result of impact from roadway objects. Rocks or other objects thrown up by cars and trucks on the roadway would not impact the sunroof with sufficient force to cause it to shatter, let alone shattering *outward*, a fact Ford is aware of as it is described in many driver complaints. More significantly, some Ford panoramic sunroofs have spontaneously shattered *while the vehicle was parked.*

> 2014 Ford Explorer. Was sitting in my new Ford Explorer Sport, when heard a loud pop like a gun. Got out and walked around car to see if something it me. . nothing Started to drive away at around 20 mph. started to hear road noise coming from sunroof. Started to retract shad wen noticed glass fragments falling, closed shad pulled over and took pictures. . contacted and have been told that something must have hit the sunroof? Like what I said a meteor!!! They laughed and said I should contact my insurance co. but that's fraud I said? Again, they laughed. . come on Ford stand behind your craftsmanship or get another owner wh2o will? Very disappointed? So what to do now?*TR

(NHTSA ID: 10595844 – Date Complaint Filed 06/04/2014)

> 2013 Ford Explorer. My panoramic sunroof exploded!! I was sitting in my vehicle, parked in the driveway and heard a loud noise. I got out and checked the tires and around my vehicle. I saw nothing unusual so I got back in, turned the air off and that's when I discovered it was the sunroof. I heard crackling of glass. Got back out and stepped in the back passenger door and looked on top – it had cracked in the shape of an x with a small pop up right in the center. It was obvious that nothing had hit the glass because I was parked in my driveway and the glass was pushed upward

> instead of inward. I took numerous pictures of the vehicle sitting in my driveway right after this happened. Drove it to the nearest dealership, within a half hour, as per the service mgr. for pre approval of warranty coverage. It was denied twice. Ford's response for denial of warranty coverage: "As per Section 3 of the warranty and policy manual, damaged glass (stone chips, scratches, etc.) is not considered a warrantable condition unless as related to another defective component. The loud noise as described by the customer has generally been found to be the time in which the glass is impacted in other similar cases. The point of impact to the glass is the place in which the glass is broken and bowed upward (bow upward due to interior cabin pressure is slightly greater than ambient pressure when windows are up and the HVAC system is running.) Unfortunately, this broken glass is considered to be damage that can not be covered under the new vehicle warranty at this time." 23 days later. . . my $40k vehicle is still damages and sitting in my garage b/c this is an ongoing issue with panoramic sunroofs exploding. Ford can not keep up with the demand for replacement glass. I pray someone, especially a child is not injured or even worse killed by this defect. *TR

(NHTSA ID: 10520728 – Date Complaint Filed 06/19/2013)

> <u>2013 Ford F-150</u>. I went out to my truck and started it up. I noticed there were tiny shiny specks on the center console. I look up and my sunroof was totally shattered. When I parked the day before everything was fine. There were no trees that something cold have fallen from that might have this. NO other vehicles parked nearby were damaged and vandals usually go for side windows. It was not unusually cold. A short search on the internet shows that this problem is not as isolated as the Ford Dealer that the body shop I'm using called. There are others with Ford products that this has happened to. Some were driving when their sunroofs exploded others came out to find their sunroofs in the same condition as mine. *TR

(NHTSA ID: 10655345 – Date Complaint Filed 11/17/2014)

**D. The Dangers Posed to Class Occupants**

43. NHTSA, KATRI, and responsible automobile manufacturers have acknowledged that the spontaneous failure of panoramic sunroofs endangers drivers, passengers, and others on the road. A panoramic sunroof is an expensive upgrade option that costs thousands of dollars to

replace. A reasonable person considering whether to purchase or lease a Ford vehicle would want to be informed about the panoramic sunroof defect before deciding whether to spend the additional money.

44. When panoramic sunroofs shatter, they make a sudden and extremely loud noise, followed by shards of glass raining down onto the driver and passengers. Drivers report that the falling shards of glass have injured them, their passengers and have caused damage to their vehicles. Drivers have also reported a number of near-miss accidents that occurred after they were startled or distracted because the sunroof shattered while the vehicle was in motion. Both Ford and NHTSA have received reports of injuries caused by sunroof failure.

45. Other manufacturers recognize the safety risk. When Volkswagen initiated a safety recall for shattering panoramic sunroofs, it acknowledged that drivers "could be injured by falling glass," and that "[i]f the glass panel were to break while the vehicle is in motion, it could cause the driver distraction, increasing the risk of a crash."

46. When Hyundai initiated is recall, it too acknowledged that the shattering of panoramic sunroofs "relates to motor vehicle safety," including by posing a risk of injury to vehicle occupants. In connection with the Hyundai recall, NHTSA wrote that the breaking of the panoramic sunroof could lead "to personal injury or a vehicle crash."

47. In connection with an Audi recall, NHTSA wrote that "should the sunroof's glass break while the vehicle is in use, the falling glass could cut and injure the driver or passengers [and] could also distract the driver, increasing the risk of a crash."

48. KATRI concluded that the sudden shattering of a panoramic sunroof while driving may cause "abrasions due to shattered glass" and also cause the "risk of secondary accidents."

49. In December of 2012, KATRI launched an investigation that culminated in November 2013 when it met with numerous car manufacturers in Seoul, South Korea, announcing its finding that the ceramic tint in panoramic sunroofs substantially weakened the glass and compromising its safety. KATRI recommended widespread recalls—a recommendation unheeded by Ford.

**E. Ford Refuses to Warn Drivers**

50. Despite the high number of complaints and the danger posed by the defect, Ford continues to conceal its existence from current and potential customers alike. Ford has neither warned consumers at the point of sale/lease nor when drivers who have experienced a shattered sunroof bring their vehicle in for repairs, making no effort to alert consumers of the risk. Ford knows of the defect yet continues to profit from the sale and lease of vehicles to unwitting customers.

51. Ford conceals the defect even though it knows it is not reasonably discoverable by consumers unless they experience a failure and are exposed to the attendant safety risks.

52. Ford remains silent even as it continues to receive complaints from concerned drivers and the NHTSA investigators.

53. As a result of Ford's inaction and silence, consumers are unaware that they purchased or leased a vehicle which has a defective sunroof, and continue to drive these unsafe vehicles. In addition, consumers who have experienced a failure and bring their vehicles to a dealership for repairs are not told that identically defective sunroofs are installed as replacements in their vehicles.

54. Other manufacturers who have had vehicles with similar panoramic sunroof problems—such as Audi, Hyundai, and Volkswagen—have all voluntarily initiated safety recalls

as a result, notifying drivers of the danger and offering to repair the sunroofs free of cost.

**F. Ford's Deceptive Warranty Practices**

55. The relevant terms of the Ford and Mercury brand Class Vehicles' warranty are substantially the same: they are backed by a bumper-to-bumper warranty that lasts for three years or 36,000 miles, whichever comes first and five-year/60,000 mile powertrain coverage.

56. The relevant terms of Ford's Lincoln brand Class Vehicles warranty are substantially the same and are backed by bumper-to-bumper coverage that lasts for four years or 50,000 miles, whichever comes first, and six-year/70,000 mile powertrain coverage.

57. Plaintiffs and class members experienced damage from the sunroof defect within the warranty periods of their vehicles. Plaintiffs and the class members reasonably expected that and all damage that resulted from the sunroof defect would be covered under the warranty, and that they would not be charged for such repairs.

58. Ford has systematically denied coverage with respect to the defective sunroofs. Plaintiffs and numerous class members have been forced to incur substantial repair bills and other related damages, including being forced to makes claims under their automotive insurance policies and incurring substantial deductibles.

**PLAINTIFFS' EXPERIENCES**

**Plaintiffs Douglas and Kathleen Krebsbach**

59. Mr. and Mrs. Krebsbach purchased a new 2013 Ford Escape EcoBoost from Folsom Ford in Folsom, Sacramento County, California in May of 2013. The Escape was equipped with a factory-installed panoramic sunroof. Mr. Krebsbach chose the 2013 Escape over a comparably priced Ford Taurus because the Escape had the optional panoramic sunroof.

60. At approximately 10:00 a.m. on February 8, 2016, Mr. Krebsbach was driving

with a passenger in the back seat on Highway 99 in Sacramento, California. Weather was clear and traffic was light. They were traveling at about sixty miles per hour when the sunroof spontaneously shattered outward with some of the edge glass falling inside the car. Both Mr. Krebsbach and his passenger thought the sunroof had been shattered by a gunshot, so he kept driving and closed the sliding shade to prevent more glass from falling inside. Both were terrified by the event.

61. Below are photographs of the failed sunroof in the Krebsbachs' 2013 Escape EcoBoost.





62. Mr. Krebsbach took the car to the Ford dealership where it had been purchased and was told that "sunroofs don't shatter unless something hits it and that he should file a claim with his insurance company," for which he paid a $250.00 deductible. While the Escape was in the shop for repair, Mr. Krebsbach was not provided a loaner vehicle. For the week until the sunroof could be repaired, Mr. Krebsbach was without a vehicle and therefore could not work.

63. Mr. Krebsbach telephoned and e-mailed Ford about the incident. Ford replied both verbally and in writing that it was not responsible for the sunroof failing and that it would not pay for the repairs.

64. Had Ford disclosed the panoramic sunroof defect, the Krebsbachs would not have purchased the vehicle or they would have paid substantially less for it. In addition, they would not have suffered the economic damages they sustained. They did not receive the benefit of their bargain.

**Plaintiffs James and Martha Alexander**

65. On or about August 13, 2014, Mr. and Mrs. Alexander purchased a new 2013 Lincoln MKX from Sandy Sansing Ford Lincoln, in Daphne, Alabama. The vehicle had been in the Sandy Sansing inventory for two years. The Alexanders had been researching new cars and were impressed with the look of the Lincoln MKX's panoramic sunroof. After speaking in detail with the dealership customer representative, they chose the Lincoln.

66. On or about April 29, 2016 at about 4:30 p.m. in clear conditions, James and Martha Alexander were driving approximately sixty miles per hour on Interstate 10 when the sunroof spontaneously shattered. Mr. Alexander thought it sounded as if lightning hit the vehicle and Mrs. Alexander thought a tire blew out. Mr. Alexander immediately exited the interstate and stopped to inspect the vehicle. They first realized that their panoramic sunroof had shattered when they noticed broken glass on the closed sunroof shade.

67. Below are photos of the damage to the Alexanders' 2013 Lincoln MKX panoramic sunroof.







68. Mr. Alexander immediately reported the damage to his insurance carrier, GEICO, and discussed that this should be a Lincoln warranty claim issue. He then spoke with a representative at Astro Lincoln, a certified pre-owned Lincoln dealer in Pensacola, Florida, and took the car in for an inspection. A technician from Lloyd's Glass inspected the damage at Astro

Lincoln, alleged that the damage was from impact, and thus coverage under the Lincoln warranty was refused. Mr. Alexander spoke with "Raul," a representative from Lincoln. He also asserted that the damage was from an impact. Next, Mr. Alexander exchanged e-mails and letters with Lincoln and Ford; his sunroof claim was denied in writing and is recorded as Lincoln Case No. is 9364173-D9R6C1. Finally, Mr. Alexander left voicemails for the president of Ford.

69. Ultimately the Alexanders paid a $100.00 insurance deductible and car rental costs of $378.50 for the time period that their Lincoln was unavailable to them while the sunroof was being replaced.

70. Had Ford adequately disclosed the panoramic sunroof defect, the Alexanders would not have purchased the vehicle at issue or they would have paid substantially less for it. Their vehicle remains within the scope of the Lincoln new vehicle warranty. They did not receive the benefit of their bargain.

## V. CLASS ACTION ALLEGATIONS

71. Pursuant to Fed. R. Civ. P. 23, Plaintiffs bring this action on behalf of themselves and all others similarly situated as members of the following proposed Nationwide and State classes (collectively, the "Classes"), on their federal and state claims as purchasers and lessees of "Class Vehicles." Class Vehicles include all models below that are equipped with factory-installed panoramic sunroofs:

(a) 2007-present model year Ford Edge vehicles;

(b) 2009-present model year Ford Focus vehicles;

(c) 2010-present model year Ford Fusion vehicles;

(d) 2011-present model year Ford Explorer vehicles;

(e) 2009-present model year Ford Flex vehicles;

(f) 2011-present model year Ford F 150 vehicles;

(g) 2009-2014 model year Ford Mustang vehicles;

(h) 2013-present model year Ford Escape vehicles;

(i) 2014-present model year Transit Connect vehicles;

(j) 2013-present model year Ford C-Max vehicles;

(k) 2007-present model year Lincoln MKX vehicles;

(l) 2009-2015 model year Lincoln MKS vehicles;

(m) 2013-present model year Lincoln MKZ vehicles;

(n) 2010-present model year Lincoln MKT vehicles;

(o) 2010-2011 model year Mercury Milan vehicles; and

(p) 2010-2011 model year Mercury Montego vehicles.

**Nationwide Class:**

*During the fullest period allowed by law, all persons and entities residing in the United States, including its territories, who purchased or leased a Class Vehicle.*

**Alabama Class:**

*During the fullest period allowed by law, all persons and entities residing in Alabama who purchased or leased a Class Vehicle in Alabama.*

**California Class:**

*During the fullest period allowed by law, all persons and entities residing in California who purchased or leased a Class Vehicle in California.*

72. Excluded from the proposed classes are Ford; any affiliate, parent, or subsidiary of Ford; any entity in which Ford has a controlling interest; any officer, director, or employee of

Ford; any successor or assign of Ford; anyone employed by counsel in this action; any judge to whom this case is assigned, his or her spouse; members of the judge's staff; and anyone who purchased the Class Vehicle for the purpose of resale.

73. Members of the proposed classes are readily ascertainable because the class definitions are based upon objective criteria.

74. **Numerosity**. Ford sold many thousands of Class Vehicles, including a substantial number in California and Alabama. Members of the proposed classes likely number in the thousands and are thus too numerous to practically join in a single action. Class members may be notified of the pendency of this action by mail, supplemented by public notice (if deemed necessary or appropriate by the Court).

75. **Commonality and Predominance**. Common questions of law and fact exist as to all proposed members of the classes and predominate over questions affecting only individual class members. These common questions include:

(a) Whether the sunroofs in the Class Vehicles have a propensity to spontaneously shatter;

(b) Whether Ford knew or should have known that its panoramic sunroofs have a propensity to spontaneously shatter, and if so, when it discovered this;

(c) Whether the knowledge of this propensity to shatter would be important to a reasonable person, because, among other things, it poses an unreasonable safety hazard;

(d) Whether Ford failed to disclose to and concealed from potential customers the existence of the sunroofs' propensity to spontaneously shatter;

(e) Whether Ford has breached its express warranty obligations;

(f) Whether the Court may enter an injunction requiring Ford to notify

owners and lessees about the sunroofs' propensity to spontaneously shatter;

(g) Whether the Court may enter an injunction requiring Ford to cease its practice of replacing shattered panoramic sunroofs with identically defective replacement sunroofs;

(h) Whether Ford's conduct, as alleged herein, violates the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq.*;

(i) Whether Ford's conduct, as alleged herein, violates the consumer protection laws of California and Delaware; and

(j) Whether Ford's conduct, as alleged herein, entitles Plaintiffs and the Classes they represent to restitution under the laws of their respective states.

76. **Typicality**. Plaintiffs' claims are typical of the claims of the proposed classes. Plaintiffs and the members of the proposed classes all purchased or leased Class Vehicles with panoramic sunroofs that have a propensity to spontaneously shatter, giving rise to substantially the same claims. As illustrated by class member complaints, some of which have been excerpted above, each vehicle model included in the proposed class definitions suffers from the same defect.

77. **Adequacy**. Plaintiffs are adequate representatives of the proposed classes because their interests do not conflict with the interests of the members of the classes they seek to represent. Plaintiffs have retained counsel who are competent and experienced in complex class action litigation, and will prosecute vigorously on class members' behalf.

78. **Superiority**. A class action is superior to other available means for the fair and efficient adjudication of this dispute. The injury suffered by each class member, while meaningful on an individual basis, is not of such magnitude as to make the prosecution of

individual actions against Ford economically feasible. Even if class members themselves could afford such individualized litigation, the court system could not. In addition to the burden and expense of managing many actions arising from the defective sunroofs, individualized litigation increases the delay and expense to all parties and the court system presented by the legal and factual issues of the case. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

79. In the alternative, the proposed classes may be certified because:

(a) the prosecution of separate actions by the individual members of the proposed classes would create a risk of inconsistent adjudications, which could establish incompatible standards of conduct for Ford;

(b) the prosecution of individual actions could result in adjudications, which as a practical matter, would be dispositive of the interests of non-party class members or which would substantially impair their ability to protect their interests; and

(c) Ford has acted or refused to act on grounds generally applicable to the proposed classes, thereby making appropriate final and injunctive relief with respect to members of the proposed classes as a whole.

## VI. TOLLING OF THE STATUTES OF LIMITATIONS

80. **Discovery Rule**. Plaintiffs' and class members' claims accrued upon discovery that the panoramic sunroofs installed in their Class Vehicles were prone to spontaneous failure. While Ford knew, and concealed, the fact that the panoramic sunroofs installed in the Class Vehicles have a defect that causes spontaneous failure, Plaintiffs and class members could not and did not discover this fact through reasonable diligence.

81. **Active Concealment Tolling**. Any statutes of limitations are tolled by Ford's knowing and active concealment of the fact that the panoramic sunroofs installed in the Class Vehicles suffered from the defect. Ford kept Plaintiffs and class members ignorant of vital information essential to the pursuit of their claim, without any fault or lack of diligence on the part of Plaintiffs. The details of Ford's efforts to conceal its above-described unlawful conduct are in its possession, custody, and control, to the exclusion of Plaintiffs and class members. Plaintiffs could not have reasonably discovered the fact that the panoramic sunroofs installed in their Class Vehicles were defective.

82. **Estoppel**. Ford was and is under a continuous duty to disclose to Plaintiffs and class members the true character, quality, and nature of the panoramic sunroofs installed in the Class Vehicles. At all relevant times, and continuing to this day, Ford knowingly, affirmatively, and actively concealed the true character, quality, and nature of the panoramic sunroofs installed in the Class Vehicles. The details of Ford's efforts to conceal its above-described unlawful conduct are in its possession, custody, and control, to the exclusion of Plaintiffs and class members. Plaintiffs reasonably relied upon Ford's active concealment. Based on the foregoing, Ford is estopped from relying on any statutes of limitation in defense of this action.

83. **Equitable Tolling**. Ford took active stops to conceal the fact that it wrongfully, improperly, illegally, and repeatedly manufactured, marketed, distributed, sold, and leased Class Vehicles with defective panoramic sunroofs. The details of Ford's efforts to conceal its above-described unlawful conduct are in its possession, custody, and control, to the exclusion of Plaintiffs and class members. When Plaintiffs learned about this material information, they exercised due diligence by thoroughly investigating the situation, retaining counsel, and pursuing their claims. Ford fraudulently concealed its above-described wrongful acts. Should such tolling

be necessary, therefore, all applicable statutes of limitation are tolled under the doctrine of equitable tolling.

## VII. CLAIMS FOR RELIEF

### COUNT I

**Violation of the Magnuson-Moss Warranty Act ("MMWA"), 15 U.S.C. § 2301, *et seq*.**

**(Plaintiffs individually and on behalf of the Nationwide class and, alternatively, on behalf of the representative State classes)**

84. Plaintiffs re-allege all previous paragraphs above as if fully set forth herein.

85. Plaintiffs and other members of the classes are "consumers" within the meaning of 15 U.S.C. § 2301(3).

86. Ford is a "supplier" and "warrantor" within the meanings of 15 U.S.C. §§ 2301(4)-(5).

87. Class Vehicles are "consumer products" within the meaning of 15 U.S.C. § 2301(1).

88. Ford provided a written warranty under 15 U.S.C. § 2301(6) to all members of the classes under which Ford warranted that the Class Vehicles would be free from defects for a minimum of three years or 36,000 miles whichever comes first.

89. Ford is required to repair or replace panoramic sunroofs that spontaneously shatter during the warranty period at no charge.

90. Plaintiff class members own Class Vehicles that experienced sunroof shattering during the period of warranty coverage.

91. Ford breached its new vehicle limited warranty by failing to repair or replace the sunroofs at no charge to Plaintiffs and class members.

92. Ford's breach of warranty deprived Plaintiffs and class members of the benefit of

their bargain.

93. The amount in controversy of the Plaintiffs' individual claims meets or exceeds the sum or value of $25.00. In addition, the amount in controversy meets or exceeds the sum or value of $50,000.00 (exclusive of interest and costs) computed on the basis of all claims to be determined in this suit.

94. Ford has been afforded reasonable opportunity to cure its breaches of warranty. Pursuant to the provisions of 15 U.S.C. § 2310(e), Plaintiffs and class members have all sent notice to Ford's principal place of business to provide it with reasonable opportunity to correct its business practices and cure its breach of warranties under the MMWA. Ford has not cured the breach of warranty described above and continues to deny warranty coverage when class members present their vehicles for repair after their Class Vehicles' panoramic sunroofs spontaneously shattered.

95. In addition, resorting to any informal dispute settlement procedure or affording Ford another opportunity to cure its breach of warranty is unnecessary and futile. Any remedies available through any informal dispute settlement procedure would be inadequate under the circumstances, as Ford has repeatedly failed to disclose the panoramic sunroof defect or provide repairs at no cost and, as such, has indicated no desire to participate in such a process at this time. Any requirement under the MMWA or otherwise that Plaintiffs submit to any informal dispute settlement procedure or otherwise afford Ford a reasonable opportunity to cure its breach of warranty—that requirement is excused and/or has been satisfied.

96. As a direct and proximate result of Ford's warranty breach, Plaintiffs and class members sustained damages and other losses to be determined at trial. Ford's conduct damaged Plaintiffs and class members, who are entitled to recover damages, specific performance, costs,

attorneys' fees, and other appropriate relief.

**COUNT II**

**Unjust Enrichment**

**(Plaintiffs individually and on behalf of the Nationwide class, and alternatively, on behalf of each of the State classes)**

97. Plaintiffs re-allege paragraphs 1 through 83 above as if fully set forth herein.

98. As described above, Ford sold Class Vehicles to Plaintiffs and class members even though the panoramic sunroofs installed in those Class Vehicles were defective and posed a safety hazard. Sears failed to disclose its knowledge of the sunroof defect and its attendant risks at the point of sale or otherwise.

99. Ford unjustly charges Plaintiffs' and class members' for repairs and/or replacement of the defective panoramic sunroofs without disclosing that the defect is widespread and that the repairs do not address the root cause of the defect.

100. As a result of its acts and omissions related to the defective sunroofs, Ford obtained monies that rightfully belong to Plaintiffs and class members.

101. Ford appreciated, accepted, and retained the non-gratuitous benefits conferred by Plaintiffs and class members who, without knowledge of the defect, paid a higher price for their vehicles than those vehicles were worth. Ford also received monies for vehicles that Plaintiffs and class members would not have otherwise purchased.

102. It would be inequitable and unjust for Ford to retain these wrongfully obtained profits.

103. Ford's retention of these wrongfully-acquired profits would violate fundamental principles of justice, equity, and good conscience.

**COUNT III**

**Violation of the Alabama Deceptive Trade Practices Act**
**Ala. Code § 8-19-1, *et seq*.**

**(Plaintiffs James and Martha Alexander, individually and on behalf of the Alabama Class)**

104. Plaintiffs re-allege paragraphs 1 through 83 above as if fully set forth herein.

105. Plaintiffs purchased their Class Vehicle at a dealership located in Alabama.

106. Class Vehicles and the optional panoramic sunroofs installed in Class Vehicles are goods or merchandise as defined under Ala. Code § 8-19-1, *et seq*.

107. Plaintiffs' and class members' purchases and leases of Class Vehicles constructed with the defective panoramic sunroofs constitute transactions or sales as defined under Ala. Code § 8-19-1, et seq.

108. Ford's sale and leasing of Class Vehicles and the defective panoramic sunroofs installed in Class Vehicles through its authorized dealers occurred in the regular course of Ford's business.

109. Ford's acts and practices, as alleged herein, constitute deceptive, unfair, fraudulent, and misleading acts and practices. In particular, Ford sold Class Vehicles to Plaintiffs and class members even though the panoramic sunroofs installed in those Class Vehicles were defective and posed a safety hazard. Ford failed to disclose its knowledge of the defect and its attendant risks at the point of sale or otherwise.

110. Ford charges for repairs of Plaintiffs' and class members' panoramic sunroofs without disclosing that the problem is widespread and that the repairs do not address the root cause of the defect.

111. Ford thus represented that its goods, merchandise, and services had

characteristics, uses, benefits, or qualities that they did not have, and that they were of a particular standard, quality, or grade when they were not.

112. Ford concealed, suppressed, or omitted material facts with the intent that the Plaintiffs and class members rely upon such concealment, suppression, or omission. Ford's acts and practices are objectively deceptive and thus likely to deceive a reasonable consumer. As described herein, Ford knowingly conceals and fails to disclose at the point of sale and otherwise that Class Vehicles' panoramic sunroofs have propensity to spontaneously fail, endangering the personal safety of occupants, other motorists and the public at large. Had Ford disclosed this fact, Plaintiffs and class members as reasonable consumers would not have purchased or leased Class Vehicles or would have paid significantly less for them.

113. Ford's course of conduct had an impact on the public interest because acts were part of a generalized course of conduct affecting the consuming public and because the facts Ford concealed, suppressed and omitted involve matters of public safety.

114. Ford's fraudulent and deceptive conduct includes knowing concealment, suppression, or omission of material facts, caused and resulted in a foreseeable injury-in-fact to Plaintiffs and class members. Among other things, Plaintiffs and class members purchased or leased Class Vehicles equipped with panoramic sunroofs they otherwise would not have purchased or leased, and were forced to pay for repairs and or replacement of shattered sunroofs that did not address the root cause of the defect.

115. Ford willfully and knowingly engaged in the conduct described above.

116. Plaintiffs and class members seek an order enjoining Ford from the unlawful business practices described herein and requiring Ford to notify class members that the panoramic sunroofs in their Class Vehicles are defective.

117. Plaintiffs and class members are entitled to legal and equitable relief against Ford, including damages, consequential damages, specific performance, attorneys' fees, costs of suit and other relief as appropriate.

**COUNT IV**

**Violation of the Alabama's Breach of Express Warranty**
**Ala. Code §§ 7-2-313 and 7-2A-210.**

**(Plaintiffs James and Martha Alexander, individually and on behalf of the Alabama Class)**

118. Plaintiffs re-allege paragraphs 1-83 as if fully set forth herein.

119. Plaintiffs and the class members experienced defects within the warranty period. Despite the existence of warranties, Ford failed to inform Plaintiffs and the class members that the Class Vehicles were designed and manufactured with defective glass and adhesive and failed to fix the panoramic sunroofs free of charge.

120. Ford breached its express warranty promising to repair and correct a manufacturing defect or workmanship of any party they supplied. Ford has not repaired or adjusted the Class Vehicles' materials and workmanship defects.

121. Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and the other class members whole and because the Ford Defendant has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

122. Accordingly, Plaintiffs, individually and on behalf of the other class members, seek all remedies as allowed by law.

123. Also, as alleged in more detail herein, at the time Ford warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, Ford had wrongfully and fraudulently concealed

material facts regarding the Class Vehicles. Plaintiffs and the other class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

124. Ford was provided notice of the panoramic sunroof defect issues by numerous complaints filed against them, including the instant complaint, within a reasonable amount of time after Ford's knowledge of the defect and to replace or repair the defect.

125. As a direct and proximate result of Ford's breach of express warranties, Plaintiffs and the other class members have been damaged in an amount to be determined at trial

**COUNT V**

**Violation of the Alabama Deceptive Trade Practices Act**
**Ala. Code § 8-19-1, *et seq*.**

**(Plaintiffs James and Martha Alexander, individually and on behalf of the Alabama Class)**

126. Plaintiffs re-allege paragraphs 1-83 as if fully set forth herein.

127. Ford was at all times a "merchant" with respect to motor vehicles under Ala. Code §§ 7-2-104(1) and 7-2A-103(3), and "sellers" of motor vehicles under § 7-2-103(1)(d).

128. With respect to leases, Ford is and at all times was at all relevant times a "lessor" of motor vehicles under Ala. Code § 7-2A-103(1)(p).

129. The Class Vehicles were at all relevant times "goods" within the meaning of Ala. Code §§ 7-2-105(1) and 7-2A-103(1)(h).

130. A warranty that the Class Vehicles were in merchantable condition and fit for the purpose for which vehicles are used is implied by law pursuant to Ala. Code §§ 7-2-314 and 7-2A-212.

131. These Class Vehicles, when sold or leased or at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used.

132. Ford was provided notice of these issues by NHTSA complaints, the NHTSA

investigation, news reports, numerous complaints and reports received internally from customers, dealers, insurance carriers, field operations, service providers, and the like—all made within a reasonable time after allegations of Class Action defects became public.

133. As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Plaintiffs and other class members have been damaged in an amount to be proven at trial.

**COUNT VI**
**Violation of the Unfair Competition Law ("UCL"),**
**Cal. Bus. & Prof. Code § 17200, *et seq*.**

**(Plaintiffs Douglas and Kathleen Krebsbach, individually and on behalf of the California Class)**

134. Plaintiffs re-allege paragraphs preceding paragraphs above as if fully set forth herein.

135. Ford has violated and continues to violate California's UCL, Cal. Bus. & Prof. Code § 17200, et seq., which prohibits unlawful, unfair, and fraudulent business acts or practices.

136. Ford's acts and practices, alleged in this complaint, constitute unlawful, unfair, and fraudulent business practices, in violation of the UCL. In particular, Ford sold Class Vehicles to Plaintiffs and class members even though the panoramic sunroofs installed in those Class Vehicles are defective and pose a safety hazard, and failed to disclose its knowledge of the defect and its attendant risks at the point of sale or otherwise.

137. Ford's business acts and practices are unlawful in that they violate the Consumers Legal Remedies Act, Cal. Civil Code § 1750, et seq. for the reasons set forth below.

138. Ford's acts and practices also constitute fraudulent practices in that they are likely to deceive a reasonable consumer. As described above, Ford knowingly conceals and fails to disclose at the point of sale and otherwise that Class Vehicles' panoramic sunroofs have a

propensity to spontaneously shatter, endangering the personal safety of drivers and. Had Ford disclosed that information, Plaintiffs and class members would not have purchased Class Vehicles or would have paid significantly less for them. Furthermore, Ford charges for repairs of Plaintiffs' and class members' panoramic sunroofs without disclosing that the problem is widespread and that the repairs do not address the root cause of the defect.

139. Ford's conduct also constitutes unfair business practices for at least the following reasons:

(a) The gravity of potential harm to Plaintiffs and class members from Ford's acts and practices far outweighs any legitimate utility of that conduct;

(b) Ford's conduct is immoral, unethical, oppressive, unscrupulous, or substantially injurious to Plaintiffs and class members; and

(c) Ford's conduct undermines or violates stated policies underlying the UCL—to protect consumers against unfair and sharp business practices and to promote a basic level of honesty and reliability in the marketplace.

140. As a direct and proximate result of Ford's business practices described herein, Plaintiffs and class members suffered a foreseeable injury-in-fact and lost money or property because they purchased and paid for Class Vehicles that they otherwise would not have or, in the alternative, would have paid less for.

141. Plaintiffs and class members are entitled to equitable relief, including an order directing Ford to disclose the existence of the defect and to provide restitution and disgorgement of all profits paid to Ford as a result of its unfair, deceptive, and fraudulent practices, reasonable attorneys' fees and costs, and a permanent injunction enjoining such practices.

**COUNT VII**

**Violation of the Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750, *et seq.***

**(Plaintiffs Douglas and Kathleen Krebsbach, individually and on behalf of the California Class)**

142. Plaintiffs re-allege preceding paragraphs above as if fully set forth herein.

143. Ford is a "person" within the meaning of Cal. Civ. Code §§ 1761(c) and 1770, and has provided "goods" within the meaning of Cal. Civ. Code §§ 1761 (b) and 1770.

144. Plaintiffs and members of the proposed California Class are "consumers" within the meaning of Cal. Civ. Code §§ 1761(d) and 1770 and have engaged in a "transaction" within the meaning of Cal. Civ. Code §§ 1761 and 1770.

145. Ford's acts and practices, which were intended to result and which did result in the sale of Class Vehicles with defective panoramic sunroofs, violate the CLRA for at least the following reasons:

(a) Ford represents that its vehicles with panoramic sunroofs had characteristics, values, or benefits which they do not have;

(b) Ford advertises its goods with intent not to sell them as advertised;

(c) Ford represents that its vehicles and panoramic sunroofs are of a particular standard, quality, or grade when they are not;

(d) Ford represents that a transaction conferred or involved rights, remedies, or obligations which they do not; and

(e) Ford represents that its goods have been supplied in accordance with a previous representation when they have not.

146. As described herein, Ford sold vehicles to Plaintiff and class members even though the panoramic sunroofs installed in those Class Vehicles are defective and pose a safety

hazard, and Ford failed to disclose its knowledge of the sunroof defect and its attendant risks at the point of sale or otherwise. Ford intended that Plaintiffs and class members rely on this omission in deciding to purchase their vehicles.

147. Had Ford adequately disclosed the defect, Plaintiffs and class members would not have purchased or would have paid less for their Class Vehicle. Furthermore, Ford charges for repairs of Plaintiffs' and class members' panoramic sunroofs without disclosing that the problems is widespread and that the repairs do not address the root cause of the defect.

148. Pursuant to the provisions the CLRA, Plaintiffs sent correspondence to Ford to provide them with the opportunity to correct their business practices.

149. Pursuant to Cal. Civ. Code § 1780, Plaintiffs seek an order enjoining Ford for the unlawful practices described above and a declaration that Ford's conduct violates the Consumer Legal Remedies Act, as well as actual and punitive damages and attorneys' fees and costs.

**COUNT VIII**

**Violation of the Song-Beverly Consumer Warranty Act, Cal. Civ. Code § 1790 *et seq*.**

**(Plaintiffs Douglas and Kathleen Krebsbach, individually and on behalf of the California Class)**

150. Plaintiffs re-allege preceding paragraphs above as if fully set forth herein.

151. Class Vehicles are "consumer goods" and Plaintiffs and class members are "buyers" within the meaning of Cal. Civ. Code § 1791. Ford is also a "manufacturer," "distributor," or "retail seller" within the meaning of Cal. Civ. Code § 1791.

152. The implied warranty of merchantability included with the sale of each Class Vehicle means that Ford warranted that each Class Vehicle:

(a) would pass without objection in trade under the contract description;

(b) was fit for the ordinary purposes for which the Class Vehicle would be used; and

(c) conformed to the promises or affirmations of fact made on the container label.

153. The Class Vehicles would not pass without objection in the automotive trade because their panoramic sunroofs have a propensity to spontaneously fail, making them unfit for the ordinary purpose for which the Class Vehicles would be normally be used.

154. The Class Vehicles are not adequately labeled because their labeling fails to disclose the panoramic sunroofs' propensity to spontaneously shatter and does not advise Plaintiffs and class members of the existence of the defect.

155. Ford's actions have deprived Plaintiffs and class members of the benefit of their bargains and have caused Class Vehicles to be worth less than what Plaintiffs and class members paid for them.

156. As a direct and proximate result of Ford's conduct as described herein, Plaintiffs and class members received goods whose condition substantially impairs their value. Plaintiffs and class members have been damaged by the diminished value of their Class Vehicles.

157. Plaintiffs and class members are entitled to damages and other legal and equitable relief, including, at their election, the right to revoke acceptance of Class Vehicles or the overpayment or diminution in value of their Class Vehicles. They are also entitled to all incidental and consequential damages resulting from Ford's conduct, as well as reasonable attorneys' fees and costs.

## IX. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that the Court enter a judgment awarding the following relief:

A. An order certifying the proposed classes and appointing Plaintiffs' counsel to represent the classes;

B. An order awarding Plaintiffs and class members their actual damages, punitive damages, and/or any other form of monetary relief provided by law;

C. An order awarding Plaintiffs and class members restitution, disgorgement, or other equitable relief as the Court deems proper;

D. An order requiring Ford to adequately disclose and repair the defective panoramic sunroofs;

E. An order awarding Plaintiffs and class members pre-judgment and post-judgment interest as allowed under the law;

F. An order awarding Plaintiffs and class members reasonable attorneys' fees and costs of suit, including expert witness fees; and

G. An order awarding such other and further relief as this Court may deem just and proper.

## X. JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury all issues so triable under the law.

DATED: September 15, 2016

Respectfully submitted,

*/s/ Crystal Foley*

Crystal Foley (SBN 224627)
**SIMMONS HANLY CONROY LLC**
100 N. Sepulveda Blvd., Suite 1350
El Segundo, California 90245
Telephone: (310) 322-3555
Facsimile: (310) 322-3655
cfoley@simmonsfirm.com

Paul J. Hanly, Jr.
Mitchell M. Breit
**SIMMONS HANLY CONROY LLC**
112 Madison Avenue
New York, New York 10016-7416
Telephone: (212) 784-6400
Facsimile: (212) 213-5949
phanly@simmonsfirm.com
mbreit@simmonsfirm.com

Gregory F. Coleman
(*pro hac vice* to be submitted)
Mark E. Silvey
(*pro hac vice* to be submitted)
Adam A. Edwards
(*pro hac vice* to be submitted)
Lisa A. White
(*pro hac vice* to be submitted)
**GREG COLEMAN LAW PC**
First Tennessee Plaza
800 S. Gay Street, Suite 1100
Knoxville, TN 37929
Telephone: (865) 247-0080
Facsimile: (865) 533-0049
greg@gregcolemanlaw.com
mark@gregcolemanlaw.com
adam@gregcolemanlaw.com
lisa@gregcolemanlaw.com

**Attorneys for the Plaintiffs**